ROBERT H. CARTER AND WIFE, AND MARY M. SMITH, *vs.* MARCUS DENNISON.—*December* 1848.

On the 20th of October 1846, *J S* applied for relief under the insolvent laws, to the commissioners of insolvent debtors for the city and county of *Baltimore,* who granted him a final discharge, appointed his permanent trustee, and transmitted the proceedings to *Baltimore* county court. His real estate was then sold by order of said court, and the proceeds brought in for distribution. The cause was then referred to the auditor in insolvency, with directions to give notice to the mortgage and lien creditors to file their claims before a certain day, and to state accounts appropriating the funds to their payment. The auditor, in account B, applied a large sum to *D's* mortgage, filed in pursuance of said notice, being first in priority, dated in 1840, and purporting to secure the sum of $16,000, loaned for the term of ten years; but, by an adjustment made between *D* and the trustee, on the ground of alleged usury, the sum actually loaned was computed at $11,495, with interest from 1840. By this application, the fund was exhausted before reaching the mortgage of the appellants who thereupon filed the plea of usury against *D's* claim, which in account C was excluded. These two accounts being submitted, *Baltimore* county court ratified the first,

allowing the claim of *D*, as adjusted, and rejected the second. Upon the motion to dismiss the appeal from this order, it was HELD :

That the order from which this appeal was taken, being one from the county court, in the exercise of its special jurisdiction over the estates of insolvent debtors, from which no appeal will lie, the motion must prevail.

By the act of 1805, ch. 110, and its supplements, the whole administration of the property of the insolvent, beginning with the sale and ending in distribution, is devolved upon the county court through their trustee, and their judgment in all matters appertaining to it is conclusive; because these are the exclusive subjects of the special jurisdiction conferred by that act.

The institution of a court of commissioners of insolvent debtors, by the act of 1816, ch. 221, and its supplements, was only designed to relieve the county court from the pressure of its increasing business, imposed by this extensive class of cases. It was but an ancillary tribunal, bound to report and return all its proceedings, and still subject, to *Baltimore* county court.

The object of the act of 1835, ch. 235, was to authorise *Baltimore* county court, *ex officio*, to require from the trustees of insolvents, who should "thereafter apply for the benefit of the insolvent laws," an annual report of the funds belonging to their trust, with a view "to cause distribution to be made among the creditors."

The 1st sec. of the act of 1836, ch. 133, extended this power to cases "pending in said court," in which the trustees had not distributed the fund, giving to such trustees; in "*cases then pending*," and *limited to such*, the right to apply "to said court, or some court of equity," for an audit, and directions to distribute or invest the funds.

The true construction of the provision in the 2nd sec. of this latter act, "that the power of the court to appoint an auditor "in insolvent cases, "shall be *concurrent with that of the court of equity*," is, that *Baltimore* county court shall have the power to appoint an auditor, in the investigation of insolvent cases, to the same *intent* that courts of equity appoint an auditor in the course of their equity jurisdiction.

But when the same section further confers, powers "*concurrent with the courts of equity in the distribution of the funds of insolvent debtors*," it assumes a power to exist which is not within the scope of chancery jurisdiction, and confers nothing, therefore, the provision is a nullity.

From a special limited jurisdiction, no appeal lies to any other tribunal, and this rule applies to the insolvent courts of this State, as courts of limited jurisdiction.

Upon the merits, it was HELD, that under the statute of this State against usury, there can be no recovery upon an usurious contract, in any proceeding instituted by the usurious creditor, either at law or in equity. If he becomes the actor and originator of the proceedings, he must fail as plaintiff; because there is no forum wherein he may enforce an agreement, declared by the law to be tainted and forbidden.

But where the debtor himself seeks relief, and brings his usurious creditor, with his contract, into a court of conscience, relief will only be extended

to him, on his paying, or offering to pay, the principal and legal interest of the sum due; upon the principle, that he who seeks equity, to obtain relief, must do equity.

In this case, where the creditor was compelled by the court, to file his mortgage before it was due, and was placed in his present position by the act of the law, he cannot be regarded as the *actor;* but the subsequent mortgagees, who interpose the plea of usury and demand relief against him on this ground, are the actors, and their case is fully within the spirit, if not the letter, of the rule, that requires equity first from them.

It is the duty of a court of equity, in a case like this, to look at all the circumstances, and if the *status* of the party before them is involuntary, to assign him an equitable position in court, in relation to all the other parties, and not to make him *the actor*, to his own prejudice, where his standing in court will bear any other more favorable construction.

APPEAL from *Baltimore* county court.

On the 20th of October 1846, *John Spear Smith* applied to the commissioners of insolvent debtors of the city and county of *Baltimore*, for the benefit of the insolvent laws. He was granted a final discharge in March 1847, having reported among his creditors. "*Marcus Dennison* for $15,000, secured by mortgage, part, if not all, in dispute," and *Margaret* and *Mary Smith*, $20,000. *John Glenn* was appointed his permanent trustee, and gave an approved bond on the 20th of October 1846. On the 3rd of November, the trustee was directed by *Baltimore* county court, to which the proceedings in insolvency had been transmitted, by the commissioners aforesaid, to sell the real estate of the insolvent. The sales made in pursuance of this order, and which were duly ratified by the court, amounted to $33,874.95. The trustee, in his report of the 7th of May 1847, states, that "the whole of the real estate is incumbered by mortgages and judgments, to more than its value," and prays that "special notice may be given to the several mortgagees to file their claims." With this report the several liens are filed as exhibits, among which, the first in date, and designated by the auditor in his account B, as claim No. 1, is a mortgage from *Margaret Smith* and her trustee, of the first and second part, to *Marcus Dennison* of the third part, dated the 15th of December 1840. This mortgage recites, that "whereas at the instance and request of the party

hereto of the first part, the party of the third part has this day lent to her the sum of $16,000; for the term of ten years, at an interest of *six per cent. per annum*, payable quarterly, for which said sum of $16,000, there has been passed and delivered to the party of the third part a promissory note, of even date, herewith drawn by *John Spear Smith*, (son of said *Margaret*,) to, and in favor of, the said *Marcus Dennison*, or order, payable at ten years after date, and for legal interest on said sum, there have been passed and delivered to the said *Marcus* forty promissory notes, dated and drawn as aforesaid, for $240 each, payable quarterly in succession." For securing these notes, the mortgage conveys certain property situated in *Baltimore* city to said *Dennison*, which, by the will of said *Margaret*, was devised to the said *John Spear Smith*, and upon her death, in 1843, come into his possession. Upon the back of this mortgage is the affidavit of *Dennison*, that the amount due on the 5th of December 1846, was $15,614.25, and also the following agreement:

"It is agreed, that in settlement of *Marcus Dennison's* mortgage, on the estate of *John Spear Smith*, that the amount due to him is adjusted at $11,495, with interest from 15th day of December 1840, till the day of sale.

JOHN GLENN, Permanent Trustee.

DAVID STEWART,

Solicitor for *M. Dennison.*

BALTIMORE, *Nov.* 12*th*, 1846."

After several intervening incumbrances, there is a mortgage, (designated as claim No. 6,) from *John Spear Smith* to *Margaret Carter*, wife of *Robert Hill Carter*, and *Mary M. Smith*, dated the 19th of January 1846. This mortgage recites, that "whereas the said *John Spear Smith* is, and stands justly indebted to the parties of the second part in the sum of $20,000, being a portion of the proceeds arising from the disposition of certain ware-houses on *Spear's* wharf, belonging to the parties of the second part, and appropriated to the use of the said *John Spear Smith*," and, to secure the payment of this sum, conveys to them the property previously mortgaged to *Dennison*.

The cause was then referred by the court to the auditor in insolvency, who was directed to give notice to the creditors of the insolvent to file their claims, and to state accounts between the trustee and the creditors of the insolvent. The auditor reported by account B, as due the appellee, $15,614.05, and *Margaret Carter* and *Mary M. Smith* each $31.33; and by account C, stated at the instance of the counsel for the appellants, and rejecting the claim of the appellee entirely, the sum of $15,676.71 was allotted to said *Margaret Carter* and *Mary Smith*. On the 27th of May 1847, the court, by agreement of parties, ratified account B, except as to claim No. 1, and directed the appellee to file further proof in support thereof. After the filing of this additional proof, the appellants, on the 21st of June, filed separate pleas, in which they allege, that the claim of the appellee is on the note for the principal sum of $16,000, filed with his said claim, and the notes for the interest on said principal sum; and that said notes, and the mortgage given to secure the same, were made and delivered to the appellee, upon an usurious and unlawful contract, entered into after the 3rd day of October 1704, and they severally plead the act of 1704, ch. 69, in bar of said claim and every part thereof. They also set forth in their said pleas, that while said notes and mortgage, to secure the sum of $16,000 and the interest thereof, were given to the appellee, only the sum of $11,495.05 was in fact loaned by him to the insolvent, in consideration of said notes and mortgage, and that but for the usury of said transaction, only the last named sum, with interest from the 15th of December 1846, would be due to the appellee. And the appellants, at the same time, severally excepted to the appellee's claim, No 1, in account B of the auditor, as being void on the ground of usury, and in their exceptions, again specially plead the usury thereof, in opposition thereto.

To these pleas the general replication was filed. And, by agreement, the testimony taken before the auditor in reference to the claim of the appellee, No. 1, was agreed to be read at the hearing of the auditor's report by either party, as if taken after, and in reference to the pleas and exceptions of the appellants. This testimony clearly establishes the fact, that the

v. 7

claim of the appellee was founded upon an usurious and un-lawful loan, made by him to the insolvent.

Upon this agreement and testimony, the claim of the appel-lee, with the pleas and exceptions of the appellants thereto, and the replications of the appellee, were submitted by the solicitors of the respective parties, and, on the 24th of June 1847, the court adjudged and ordered, that the exceptions and pleas of the appellants should be overruled, and the claim of the appellee, as stated in account B, should be finally ratified and confirmed, and that account C should be rejected. From which decree the appellants appealed.

The cause was argued before SPENCE, MARTIN, MAGRUDER and FRICK, J. On motion to dismiss the appeal and on the merits.

BROWN and BRUNE for the appellants, contended :

1st. That an appeal lies from the decree of *Baltimore* county court, of the 24th of June 1847.

2nd. That said decree should be reversed; because the ap-pellee's claim being founded on an usurious and unlawful contract of loan, made between him and the insolvent, was, by such usury, rendered null and void, and the appellee was thereby debarred from setting up said claim against the insol-vent, and also from recovering his said claim, or any part thereof, out of the proceeds of the property mortgaged to secure the said loan.

Under the second point, they argued :

1st. That the note and mortgage, filed by the appellee as the evidence of his claim, were given upon an usurious and illegal contract, by reason of which he would be prevented from recovering on said note and mortgage, independently of the provisions of the act of 1845, ch. 352.

2nd. That the objection and defence of usury to the appel-lee's claim have been properly taken and pleaded, according to the requisitions of the law previous to the act of 1845, as well as under that act, even if its provisions should be held to extend to this case.

3rd. The appellants being subsequent mortgagees of the property affected by the usurious mortgage, may plead the usury affecting the mortgage of the appellee, so as to bar him from asserting his claim to, or lien upon the proceeds of the mortgaged property.

4th. The principle of courts of equity requiring a party, who seeks in them to be relieved from an usurious contract, to pay or tender the amount actually loaned by the usurious lender, does not apply to this case, so as to make valid the claim of the appellee in whole or in part.

5th. That the provisions of the act of 1845, do not apply and were not intended to extend to a case like this.

6th. That if it should be held that the act of 1845, was intended to extend to a case like this, yet as the appellants, for a valuable and legal consideration, acquired their lien on the mortgaged property of the insolvent before the passage of that act, and when, by reason of the usury in the appellee's contract with the insolvent, the mortgage previously given to the appellee had no validity in law to give the appellee a lien on the property mentioned in said mortgage, or its proceeds, but, on the contrary, was declared by the law to be utterly null and void, the said act, under these circumstances, should be held to have no operation to make valid the security of the appellee, and invalidate the security of the appellants; because, in so operating, it would not only divest or impair legal and vested rights, but, at the same time, destroy the security and violate the obligation of the contract between the appellants and the insolvent, and would therefore be repugnant to the fundamental principles of right and justice, unconstitutional and void.

C. J. M. Gwinn and David Stewart for the appellee, contended :

1st. That under the circumstances of this case, the appellee is entitled to be reimbursed and paid out of the fund, the actual amount of his advances to the insolvent.

2nd. That the decision of *Baltimore* county court, acting upon the distribution of the estates of insolvent debtors, is final

and conclusive, and that no appeal lies therefrom to any other tribunal.

MAGRUDER, J., dissented in part, and delivered the following opinion :

Until the passage of the act of 1804, for the relief of insolvent debtors, all applications were required to be made, by persons of that description, to the chancellor, and he alone was authorised to act upon such applications, and to grant the relief which was sought.    The proceedings, preparatory to to the discharge, were very much as now, except that the chancellor only could order or sanction them.

These annual insolvent acts, created an insolvent's court, of which the chancellor was the judge, as he was of the land office, received compensation for his services therein, distinct from the salary paid to him as chancellor and judge of the land office, and had power to do some acts *ex officio*, and to frame issues for the trial of facts, when he thought them necessary. These were powers conferred upon him by act of Assembly, and a grant of them would have been unnecessary, if, in acting upon the application of an insolvent, he was acting as chancellor, and exercising any branch of chancery jurisdiction.

The necessary consequence of any application to him and discharge of the insolvent, was, that the estate given up by the insolvent, created a trust fund in the hands of his trustee, who possessed the same powers, had to perform the same duties, and was responsible in the same way, that any other trustee for the benefit of creditors is.    To the creditors the trustee was responsible, and, in the chancery court, might be made to render an account and complete his trust, and this without any additional powers conferred, by the insolvent or other laws, upon that court.    To compel trustees, (no matter whether appointed by the chancellor, in consequence of an application by a debtor for his discharge under the insolvent law, or by the debtor himself, by deed, conveying property in trust for the benefit of his creditors,) to discharge their trust, was, and always had been, an acknowledged branch of chancery jurisdiction.

The regular course of proceeding when a *cestui que trust*, or any person interested in the trust fund, wished the trust to be completed, was, to file a bill, and this would be the commencement of a regular chancery suit, to be conducted as such, and, in the course of time, to be ended in a decree, by the chancellor distributing the trust fund. From this decree, any party who thought himself aggrieved, no doubt had a right to appeal, as well as from any other decree.

If, then, the chancellor was still the person to receive insolvent's applications, and grant discharges, and the application in this case had been made to him, and he had passed the order now appealed from, there can, it is believed, be no doubt that an appeal would lie from that order.

The *insolvent jurisdiction* has been taken from the chancellor, though without taking from him any portion of his jurisdiction in cases of trusts, and to that court the parties interested in this trust fund, must have applied for relief, if no such power to grant them relief had been conferred upon any other tribunal. It would not, of necessity, belong to the tribunal which granted relief to the insolvent.

The county courts might have been invested with the power to appoint a trustee, take his bond, and grant a final discharge, without any power to call that trustee to account, and had certainly no such power in 1804. A law conferring upon them that power, would be an enlargement of their equity jurisdiction. This power, no doubt, has been conferred by a later act of Assembly, (1814, ch. 94,) giving to the county court, very extensive equity powers indeed.

It is alleged, that the power to distribute the trust fund among the creditors, as well as the power to grant the discharge, is in the county courts, and it seems to be thought by some, that in these acts, they are sitting as a court of common law. This can scarcely be true, nor is it true, as thought by some, that this is a common law court, possessing some chancery powers. It is one court, possessed of common law and chancery jurisdiction, but it would be as correct to say, that it is a court of equity, possessed of some of the powers of a court of common law, as to call it a court of law, exercising occasionally equity

powers, when "sitting as a court of equity." These courts are not exercising common law jurisdiction, when settling an account between the trustee of an insolvent and the creditors, or ordering the trustees to render an account of the trust fund, and a common law court would find some difficulty in exercising such powers, even if the law directed them, in the discharge of these duties, to act as a common law tribunal. In *1st Bland*, 67, it is said: "If the legislature directs any thing to be done, it either provides the means to be pursued to effect its object, or it is partially or wholly silent as to the manner of proceeding. If the prescribed means are such, as can only be exercised at common law or in equity, then the one or the other of those tribunals must be clothed with exclusive jurisdiction accordingly, or the enactment may be such, as to allow them to have concurrent jurisdiction. But, if its nature be such, that the prescribed mode can be executed by neither, or the right given be such, that, according to their several limited and settled modes of proceeding, neither of them can grant proper redress, they cannot, in any way, supply the deficiency; because, even upon *English* authority, a court of justice cannot be permitted, in any case, to *legislate;* and because, by the constitution of our republic, the three departments having been directed to be kept forever separate, the judiciary has been expressly excluded from every species of legislation, and is precluded from supplying any omissions of the legislature, however obvious and necessary it may be for attaining the object in view." *Lord Eldon,* in *2nd Jacob & Walker, p.* 371, remarks: "If the powers of both, (equity and common law,) taken together, can give the king's subjects nothing but an action for damages, it is a defect which, whether it proceeds from mistake on the part of the legislature, or, if I may presume to say so, from negligent inattention, no court can supply. The legislature has not entrusted that authority to courts of justice. It is not said, that they can legislate, but that the act is to be carried into execution by the known rules of law and equity. What the legislature has directed to be done, or may have prohibited, the courts, as far as their known rules and principles will permit, will endeavor to enforce; but if their

known rules and principles will not supply a remedy, if the legislature has mistaken its way, no court of justice can supply the deficiency."

The act of 1785, chap. 33, enables land-holders to have their lands marked and bounded. That law "provides the means to be pursued, to effect the object." If, however, this had not been done, if the law had merely authorised an application to the county courts, and had directed the courts, when such applications were made to them, to proceed to have the land marked and bounded, "the rules of the courts of common law or of equity, would have been insufficient to assure to the citizen any right which it was intended that he should derive from that law:" the law would have been a dead letter, until the General Assembly made provision for carrying it into effect; yet such law, perhaps, would not have been more defective, than an act of Assembly to direct a court, without equity jurisdiction, to settle up insolvent estates. A court of common law, perhaps, might, by the old action of account, afford a partial, but it would have been a very inadequate remedy. The mode to be pursued, in order to a settlement of the estate of an insolvent applicant, is precisely the same, as it would be if the debtor, instead of applying for a discharge under the insolvent laws, had made an arrangement with his creditors, and had conveyed his property, or a portion of it, to an individual, in trust, to sell the same, and appropriate the proceeds of sale to the payment of his debts. In such a case, any party aggrieved may appeal, and I can perceive no reason for denying to a party, who supposes himself to be aggrieved, in the settlement of an insolvent's estate, the same right of appeal.

In the case of bankruptcy in *England*, this right of appeal may be denied, but our ancestors were not very partial to the bankrupt system of *England*, and are not understood to have adopted any provision peculiar to it. The reasons which exist in *England* for denying in any such cases a right of appeal, do not exist here; and here, the right of appeal as given by law, cannot be abridged by provisions to be found in the bankrupt law of *England*, or in that which has existed in the *United States*.

My opinion then, is, that the legislature possesses the power, and may at any time exercise it, to take the right of appeal from all parties interested in cases like this; but, until denied by the legislature, the right exists, and I can discover no law which excepts cases of this description, from the remedy by appeal given to parties aggrieved, by the decisions of the county courts, sitting in those cases, not as courts of common law, but as courts of equity. I am therefore for entertaining the appeal.

My warrant for affirming the decree of the court below in this case, I find in *Scott vs. Nesbit, 2nd Bro. Chan. Rep'ts,* 640.

FRICK J., delivered the opinion of this court.

The present appeal is from an order of *Baltimore* county court, passed in certain proceedings had before that court, in the case of *John Spear Smith,* an insolvent debtor, in relation to the distribution of the funds arising from the sale of the real estate belonging to the insolvent, among the various lien and mortgage creditors of the said insolvent.

The first mortgage in priority, dated in 1840, is from *Margaret Smith,* the mother, (who at that time was the owner of the property,) to the appellee, and purports to be for the sum of $16,000, lent and advanced to her for the term of ten years, at an interest of six per cent. per annum, payable quarterly; for which sum the said *John S. Smith* gave his promissory note to the appellee, together with forty other notes, covering the interest at the respective periods at which it should become due and payable.

*John Spear Smith,* subsequently acquired the property by devise from his mother, and mortgaged the same to various other creditors; and among these, last in order, to the appellants, *Mary Carter,* wife of *Robert Hill Carter,* and *Mary M. Smith,* his daughters, for $20,000, "a portion of the proceeds of certain property belonging to the appellants, and appropriated to the use of the said *John Spear Smith:*"—as appears by the mortgage, filed as part of the record in this cause.

On the 20th of October 1846, *Smith* applied for the benefit of the insolvent laws; and *John Glenn,* regularly and duly appointed his trustee, having made sale of the real estate, so

belonging to said *Smith* at the time of his application, brought the proceeds into *Baltimore* county court for distribution.

In the reports of the sales so made, the trustee states to the court, that the whole of the real estate of the insolvent is encumbered with liens and mortgages to more than its value; and prayed a special notice to such lien creditors to file their claims, for the purpose of having their liens settled and paid. The court passed an order, referring the reports to the auditor; and requiring him to give notice by advertisement, to the mortgage and lien creditors, to file their claims before a certain day; directing him, also, to prepare an account, appropriating the fund in the hands of the trustee, to the payment of the mortgage and lien creditors.

The several mortgages and liens being filed with the auditor, in compliance with this order, he proceeded to state the account, applying the fund, in the first place, and in the order of priority, to the payment of the claim of the appellee; and then, in succession, to the other mortgages, in the order of their date, so that on reaching the claim of the appellants, the fund was exhausted, and they were excluded from all participation.

The appellants hereupon filed against the appellee's claim, the plea of usury, in due form; claiming, on that ground, another audit and account, to have the appellee excluded from the distribution, and themselves allowed to come upon the proportion of the fund, which would result from his exclusion. This account was accordingly stated, shewing, upon the rejection of the appellee's claim, a balance applicable to appellants' claim, of $15,676.

Before the statement of the first account, and prior to the sale of the property, on the ground of this alleged usury, an adjustment had taken place between the trustee and the appellee; and by agreement, the sum actually paid and advanced was computed at $11,495, with interest from 1840, and conceded to be fairly due by the trustee.

On the part of the appellants, testimony was taken to establish the usury; and thereupon, the two accounts being submitted, the court below ratified the first account, allowing the appellee his claim, as adjusted by the agreement with the trus-

tee, and rejecting the second account.   From this order the appellants appeal, and contend: " That the claim being founded on an usurious and unlawful contract of loan, between the appellee and the insolvent, was thus rendered null and void; and that, thereby, the appellee was debarred from setting up any claim against the insolvent, or from recovering any part thereof out of the proceeds of the property mortgaged to secure said loan."

The appellee, on the contrary, maintains, that he is entitled under the circumstances of the case, to be reimbursed and paid out of the fund, the actual amount of his advances to the insolvent; and that the decision of *Baltimore* county court, acting upon the distribution of the estates of insolvent debtors, is final; and thereupon has moved that the appeal taken by the appellants be dismissed.

The majority of this court are of opinion that this motion must prevail, because the decision of *Baltimore* county court in the premises, is final and conclusive.

It arises out of a proceeding, originating and progressing entirely on the insolvent debtors' side of that court, under the special jurisdiction given in such cases by the act of 1805, ch. 110, and its supplements; and, in the course of distribution of the estate of an insolvent, under that act.   By its provisions, the application of the party is to be made to the county court, and upon complying with its requirements, the court is to grant him a discharge.   He is required to execute to a trustee appointed by the court, a deed of conveyance of all his property; and under their direction, the trustee is to make the sale thereof, and the distribution of the proceeds among his creditors. The whole administration of the property of the insolvent, devolves upon the court, through their trustee.   He is authorized to to make sale of it, clear of all incumbrances; and out of the proceeds, is directed by the law, to satisfy all mortgages, judgments and liens, according to their priority.   Under the 12th section, the court exercises the control over this distribution, by notice to all parties, to bring in and declare their claims, for that purpose.   So that, beginning with the sale and ending in distribution, having the entire jurisdiction over the

estate of the insolvent, their judgment in all matters appertaining to it is conclusive; because they are the exclusive subjects of the special jurisdiction conferred by that act. The court is therein restricted, to the specially delegated objects to which it refers;—the case of insolvent debtors. All the subsequent changes, (and they are numerous, as regards *Baltimore* county court,) leave this jurisdiction over sales and distribution, precisely where it rested under the act of 1805. The institution of a court of commissioners of insolvent debtors, by the act of 1816, ch. 221, and the supplements to that act, were only designed to relieve the county court, under the pressure of its increasing business, from the additional labor imposed by this extensive class of cases in that court. It was but an ancillary tribunal, bound to report and return all its proceedings, and still subject, to *Baltimore* county court. And although the aid of these commissioners was required to carry the insolvent application through its several stages to a discharge, the county court still retained the whole control over the acts of the trustee.

The act of 1836, ch. 133, "For the despatch of business in *Baltimore* county court," is supposed to have produced the change on which this right of appeal is founded, by engrafting upon this special jurisdiction, equity powers; and upon the subject matter here in question, giving to the court concurrent powers with the court of chancery.

That act was only auxiliary to the act of 1835, ch. 235; the object of which was to authorize *Baltimore* county court, *ex officio*, to require from trustees of insolvents, "who shall hereafter apply for the benefit of the insolvent laws," an annual report of the funds belonging to their trust, with a view "to cause distribution to be made among the creditors." Before this act, it was the practice of some trustees, to distribute the fund at their leisure; and occasionally, to omit it altogether. With this explanation, the propriety of the provision is manifest. It defined the extent and power of that court over their trustees, to bring them annually before the court to account. Now, the 1st section of the act of 1836, extended this power to cases "pending in said court," in which the trustees of

such debtors had not yet distributed the fund; giving to such trustees, "*in cases then pending*," and *limited to such*, the right to apply "to said court, or some court of equity," for an audit and directions to distribute or invest the funds. The provision in the second section, "that the power of the court to appoint an auditor," in insolvent cases, "shall be *concurrent with that of the courts of equity*," if construed to have reference to insolvent cases in those courts, is not susceptible of any practical application; because the courts of equity, properly speaking have no jurisdiction in insolvent cases. If, however, it is interpreted to mean, that *Baltimore* county court shall have the power to appoint an auditor, in the investigation of the insolvent causes brought before them, to the same intent that courts of equity appoint an auditor, in the course of the exercise of their equity jurisdiction, the clause is then intelligible, and susceptible of practical operation. It comports with the title of the act : "To facilitate the dispatch of business in that court:" and being consistent with the reasonable intention of the legislature, such must be deemed the true construction. But when the same section further confers powers, concurrent with the courts of equity in the distribution of the funds of insolvent debtors, it assumes a power to exist, which is not within the scope of chancery jurisdiction, and confers nothing. All the power and jurisdiction in cases of insolvent debtors, had been before delegated to the county courts and orphans courts of the State; and the courts of equity have no action or control over this branch of jurisdiction. Therefore, no such power existed, to which the grant of the act of 1836 could be made to apply; and the provision is a nullity.

In addition to this, it may be remarked, that in the distribution of insolvents' estates, the county courts always proceed according to equity principles. It was the duty and practice of those courts, before the passage of the act of 1836; (1 *H. & G.*, 96, *McCulloh vs. Dashiell,*) and it is not improbable that the framers of this provision, at the time, overlooked this principle, to which all the county courts in the State, exercising jurisdiction in insolvent cases, must conform. The whole being one entire system, resting on the same principles, this enactment,

in the design apparent on its face, prescribes nothing which *Baltimore* county court was not bound to perform, and which was not attained before it was enacted.

That from a special limited jurisdiction, no appeal lies to any other tribunal, (see 8 *G. & J.*, 448, *Wilmington Rail Road vs. Condon;* and *Savage Manf. Company vs. Owings,* 3 *Gill*, 497.) And in its particular application to the insolvent courts, as courts of limited jurisdiction, (see 5 *Gill*, 89, *Williams vs. Williams,*) where the appeal of the trustee from an order of the county court, in the case of an insolvent debtor, was rejected by this court; while in the case of *Ellicott vs. Ellicott,* in 6 *G. & J.*, 35, it had previously been decided, that a trustee, *appointed by a court of chancery,* in his character as trustee, may, for the benefit of the creditors, appeal to this court against an order in chancery.

The order on which the present appeal is taken, being one from the county court, in the exercise of its special jurisdiction over the estates of insolvent debtors, from which an appeal will not lie, this appeal is therefore dismissed.

The case, however, having been fully and ably discussed, as well upon the merits as upon this preliminary motion, (and the court, not entirely unanimous in their decision upon the motion,) we proceed to state the opinion formed upon the merits, in which they all concur, and from which it will result, that the appellants have sustained no prejudice, by this summary disposition of their case, upon the motion to dismiss it.

There is no doubt in the mind of the court, that the note and the mortgage filed by the appellee as the evidence of his claim, was founded upon an usurious and unlawful loan, made by him to the insolvent; and that under our statute against usury, he would be debarred from a recovery on his contract, in any proceeding instituted by him for that purpose, either in law or in equity. "Where all usurious contracts are declared by law to be null and void, there can be no recovery, either at law or in equity, in a suit infected with usury, if the defence of usury be pleaded." *Trumbo vs. Blizzard,* 6 *G. & J.*, 23.

Thus, then, if *Dennison* is seeking to enforce his lien upon the mortgage premises in a court of chancery, the plea of usury

is a full defence to his application.   He is met at the threshold,
with the objection that his contract is void, and he is dismissed,
even without redress, to the extent of the amount actually and
*bona fide* due to him.   He has made his contract with refer-
ence to the law, and is presumed to know, as one of its conse-
quences, that no court of law or equity will lend its aid to
sustain an infected contract.   The door of justice is barred
against his application for relief, upon an agreement made in
violation of the letter and the policy of the law.   Whatever
moral obligation may subsist between him and his debtor, the
law creates and defines the *legal* operation of his contract, and
denies any interposition, at his own instance, to enforce it.
He is thus doomed to a passive position, and the certain loss of
his debt, unless the way to relief is opened by the debtor him-
self, or in some other form.   This the debtor may do by his
own act, and give vitality to the obligation otherwise inert and
void.   If he seeks relief from his creditor on the ground of
usury, claiming the legal dispensation from his contract; if the
circumstances compel him to address a court of equity, to relieve
his property from the incumbrance of the creditor's lien; if he
brings this *usurious creditor, with his contract, into a court of*
conscience; he is at once warned, that he must do equity him-
self before he can ask it of others.   He is required to pay or
tender the actual amount of money advanced, as a preliminary
to any action on the part of the court.   For "there is a recog-
nized distinction between that and the case of a mortgagor, who
goes into chancery seeking relief against the mortgage on the
ground of usury; which will only be extended to him on his
paying, or offering to pay, the principal and legal interest of
the sum due, and this upon the principle, that he who seeks
equity, to obtain relief, must do equity." 6 *G. & J.*, 24,
*Trumbo vs. Blizzard.*

In such a case the debtor becomes the complainant, and is
properly subject to this just and universal principle of equity;
while, if he waits for the action of his creditor, it is otherwise.
When he becomes the actor and the originator of the proceed-
ing, he must fail as a plaintiff, either in a court of law or
equity, and he must lose his debt; because there is no *forum,*

wherein he may enforce an agreement, declared by the law to be tainted and forbidden.

Now, what is the attitude of *Dennison* here? Is he *the actor* as is contended by the appellants? Let it be remembered, that the term for which his loan was made has not yet expired; and, by the condition of his mortgage, the debt from the insolvent is not due to him until 1850. He has no claim in law or equity founded upon his contract, nor can he place himself, of his own will and motion, in the position of plaintiff against his debtor. He is called then into his present predicament by the order of the court; in other words by the act of the law. In the administration of its policy in regard to insolvent debtors, the law has superseded the action of the creditors, and invested its trustee with the control and disposal of the insolvent's property. By the action of the trustee, the property is converted into a fund, which is brought into court for distribution, according to the respective equities of the creditors. If he stands aloof and declines to come in, his debt is forever gone. He has then no alternative. His security is withdrawn from his grasp by the act of the law, and he is warned to come in upon the fund, or be forever precluded from any claim, either upon the property or upon the fund. But for this interposition of the court, he might have stood off from any participation in the proceeding. He must have remained passive from necessity, for his mortgage debt was not yet due, and he was in no condition to act. And, even if due, anticipating the consequence of any movement on his part, he would, for his own interest, have awaited the attack, which would place him on equitable grounds, and secure him his debt.

What then is his relation to the appellants, who are seeking to make him *the* actor in these proceedings? They are the alienees of the mortgagor, and stand in his place. They cannot claim to stand in a better position. *Dennison* has instituted no proceeding against them or the property. We have seen that he could not. He comes therefore into court upon the same terms and under the same authority with the appellants, and when he presents his claim, as required by the order of the court, which leaves him no option, the appellants inter-

pose the plea and exceptions by which they attack and impeach it. Surely, by every sound analogy and reason in law, they are the actors. They demand to be relieved as against him, and thus bring their case fully within the spirit, if not up to the strict letter and meaning of the rule, that requires equity first from them. "Where the plaintiff has the assistance of a court of equity, to set aside an usurious contract, it must be on the terms of paying what was really advanced, with legal interest." 2 *Brown's Ch. R.*, 640, *Scott vs. Nesbit.* See, also, *West vs. Beanes*, 3 *H. & J.*, 568.

We must bear in mind, that *Dennison's* security is the property mortgaged to him. Upon *Smith's* application for the benefit of the insolvent laws, the property is, by law, placed under the control of the trustee, and without the consent of the lien holders, converted into money. This fund brought into court is substituted for, and there represents the property. The legislature, by conferring on the trustee the whole estate and authority to sell it, never designed to divest the lien holders of their pre-existing rights, or to place them in a worse position than they sustained before his appointment. And when the trustee sells, and the money is brought into court, it is as if the property itself was there under the former existing priorities. Whatever preference the creditor had upon the property, he has upon the fund; and when a subsequent mortgagee comes in upon the fund, impeaching a preceding lien, when he proposes to make his own security available, by attacking the prior lien of another creditor, equity, *in every view of such a case*, must regard him as the complainant and actor, and before he receives equity, he is bound to concede it to others.

To consider *Dennison* the especial actor in this proceeding, by selecting him among all the creditors, would be straining the law to a point, which the circumstances will not justify. He asserts no right to the rigorous exaction of his contract. The law has undertaken to abridge its terms, by making it *solvendum in præsenti*, when its limitation was extended, by express covenant, to the year 1850. And to call him into court before the expiration of his time, and before he himself claims, or can claim, of his own motion, the strict letter of his

bond, entitles him, by every fair consideration, to the equitable abatement of the severity of the law.

This purports to be an appeal from equity. The assets of insolvents are always administered upon equitable principles. 1 *H. & G.,* 96, *McCulloh vs. Dashiel, (ante.)* And yet it is claimed by the appellants here, to enforce the utmost rigor of the law. To do so, would be to violate every principle of equity; first, to coerce his appearance in court, and then strip him of every dollar of his immatured claim: *Summum jus, summa injuria.*

To allow him the full amount of his actual advances, as the court below has done, is no novel application of chancery principles. It is a result reached upon the known pathways of equity. It is the duty and the proper province of a court of equity in a case like this, to look at all the circumstances, and if the *status* of the party before them is involuntary, and not of his own seeking, to assign him an equitable position in court, in relation to all the other parties; not to make him *the actor* in the proceeding, to his own prejudice, where he has not selected it himself, and his standing in court, will bear any other, and a more favorable construction. Upon these grounds, but for the previous disposition of the case on the preliminary motion, we should have sustained the judgment of *Baltimore* county court in the premises.

APPEAL DISMISSED WITH COSTS.